Present:  All the Justices

MOORE & MOORE GENERAL
CONTRACTORS, INC.
                              OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 961324                  April 18, 1997

BASEPOINT, INC.

            FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                      J. Peyton Farmer, Judge


     The parties to this dispute agree that its outcome is

controlled by the Uniform Commercial Code — Sales (UCC), Code

§ 8.2-101 et seq.  The central issues on appeal are whether,

under the facts, a buyer's acceptance of nonconforming goods can

be revoked because of the nonconformity, and whether,

notwithstanding the inability to revoke, the buyer is entitled to

recover from the seller the cost of substitute goods.

     This controversy stems from a contract between a

subcontractor and a general contractor in connection with

construction of a Red Lobster restaurant in Spotsylvania County.

 Basepoint, Inc., the subcontractor, entered into an agreement

with Moore & Moore General Contractors, Inc., the general

contractor, to supply casework, including cabinets, and interior

trim items for the facility, which was owned by General Mills

Restaurants, Inc.

     Moore & Moore, the buyer, refused to pay for cabinets

delivered by Basepoint, the seller.  Thereafter, the seller

timely filed a memorandum of mechanic's lien in the sum of

$28,080 and the present bill of complaint to enforce the lien.

Named as defendants to the bill were the buyer and the owner.

     In its answer, the buyer denied indebtedness to the seller,

claiming the materials supplied were defective.  In addition, the buyer filed a cross-bill seeking recovery of approximately $47,000 to cover the cost of removing the "defective" casework, rebuilding the casework, and finishing the remaining work under the seller's contract.

Subsequently, by order, the property was released from the lien upon the filing of an appropriate bond as provided by Code § 43-70.  The owner then was dismissed from the suit.

The cause was referred to a commissioner in chancery, who conducted an evidentiary hearing.  The facts were presented through ore tenus testimony, a de bene esse deposition, and documentary exhibits.

The commissioner submitted a report finding that the lien was valid, that the seller was entitled to judgment against the buyer in the sum claimed, and that the buyer was not entitled to judgment on its cross-claim.

The trial court overruled the buyer's exceptions to the commissioner's report and confirmed it.  The buyer appeals from the March 1996 final decree.

Upon appellate review, a commissioner in chancery's factual findings based on ore tenus evidence that are confirmed by the trial court are given great weight.  These findings will be reversed only if they are plainly wrong or without evidence to support them.  Cooper v. Cooper, 249 Va. 511, 518, 457 S.E.2d 88, 92 (1995).

The commissioner made the following factual findings. In connection with the bidding process for the Red Lobster project, the buyer provided the seller, which makes and sells woodwork, with plans and specifications prepared by Vision III, an architect, dated in November 1990. The seller made a proposal in December 1990 to the buyer "to furnish millwork items in accordance with plans and specifications, prepared by Vision III, dated 11-30-90." These items included custom-made cabinets such as bar cabinets, food service cabinets, overhead office cabinets and restroom vanity cabinets. Shop drawings then were prepared and accepted by the parties.

The Vision III plans provided that all cabinets would be made of wood. The approved shop drawings made reference to the use of "melamine." There was a dispute in the evidence over the meaning of "melamine." The seller offered evidence to show that "melamine," as used in the shop drawings, referred to a composite product with a particular type of hard finish. The buyer presented evidence that the word "melamine" referred only to a finish, which can be placed on composite material or wood. According to the buyer, reference in the shop drawings to "melamine" meant that the seller was authorized to provide wood covered with "melamine," not a composite material covered with a hard surface.

In making his factual findings, the commissioner principally relied upon the ore tenus testimony of Donnie Ray Hall. Called

as a witness by the seller, Hall had been the buyer's job superintendent for the Red Lobster project. Hall, a contractor who was experienced in millwork and carpentry, worked under the buyer's field superintendent, Allen L. Lyle.

According to Hall, he and Lyle were aware of the reference to "melamine" in the shop drawings and that the Vision III plans called for the use of plywood cabinets. Describing "melamine" as "a product with a particle board core in it," Hall testified that Lyle "knew" that particle board was to be used instead of plywood, that he and Lyle concluded the owner "would not know the difference" were it used in place of plywood, and that the particle board was a product that would perform "just as well" as wood in these circumstances.

Upon delivery of the cabinets to the jobsite between March 19, 1991 and April 12, 1991, Hall and Lyle inspected them and "did see it was particle boards." Hall found the product to be "in A-1 shape . . . other than . . . what it was made of." According to Hall, Lyle "had to get" the exposed ends of the work "covered up" with drop cloths before installation so that the owner's inspector would not see "these products prior to" installation. Hall testified that Lyle "thought he was saving money" by accepting the cabinets as delivered.

Lyle then directed installation of all the cabinets and every one was installed prior to the inspection by the owner's representative. On May 1, 1991, the owner's inspector examined

the installed millwork.  He rejected the cabinets, stating they did not conform to the plans and specifications.  On May 2, 1991, the buyer sent a letter to the seller stating, "On Wednesday, May 1, 1991, it was discovered that most of your casework is constructed of particle board.  Since the plans [] we provided you for the above referenced job [] call for plywood, all of the casework that has particle board does not conform and must be replaced."  In the letter, the buyer set the following Tuesday as the deadline for delivery of the replacement material, noting that the seller already had notified the buyer's field superintendent it could not meet the deadline.

Later, Hall was told by one of the buyer's executives "that Allen Lyle had made a big mistake and they had used the wrong products, they had approved the wrong products to be used in the cabinets."  According to Hall, the executive "felt that his man was really at fault and had made a mistake in this."

Upon removal of the cabinets made of particle board, the buyer immediately procured plywood replacements from another subcontractor.  The new cabinets were installed promptly and the project was completed nearly on time.

UCC § 8.2-601, dealing with a buyer's rights on improper delivery, provides, as pertinent, that if "goods . . . fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest."

- 5 -

UCC § 8.2-606, dealing with what constitutes acceptance of goods, provides, as pertinent, that "(1) Acceptance of goods occurs when the buyer . . . (c) does any act inconsistent with the seller's ownership. . . ."

The buyer's installation of the nonconforming cabinets constituted an "act inconsistent with the seller's ownership" and thus amounted to an acceptance of the goods under § 8.2-606(1)(c). The buyer does not dispute this conclusion. Instead, the buyer contends that it properly revoked its acceptance of the cabinets because of their nonconformity to the plans and specifications.

The buyer had no right, however, to revoke the acceptance. The buyer, through its field superintendent and job superintendent, had full knowledge that the cabinets supplied by the seller did not conform to the plans and specifications. The consequences of an "acceptance" under these circumstances is clearly set forth in UCC § 8.2-607(2). The statute provides that a buyer's acceptance of goods "precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it. . . ." In other words, revocation is unavailable for a nonconformity known to the buyer at the time of acceptance, except under circumstances not present here. See Official Comment 2.

But § 8.2-607(2) also provides that "acceptance does not of itself impair any other remedy provided by this title for

- 6 -

nonconformity."  The buyer contends that while acceptance of the cabinets entitles the seller to payment of the contract price of approximately $28,000, the nonconformity of the goods entitles the buyer to judgment on its cross-bill for approximately $47,000 for the cost incurred to remove and replace the nonconforming cabinets.  Thus, the issue arises whether the buyer is entitled to recover under its cross-bill.

The buyer based its cross-bill on only the "cover" remedy available under UCC §§ 8.2-711 and -712, which allow a buyer to recover for procurement of substitute goods.  Under § 8.2-711, the "cover" remedy is available in four situations:  when the seller "fails to make delivery;" when the seller "repudiates" the contract; when the buyer "rightfully rejects" the goods; and when the buyer "justifiably revokes acceptance" of the goods.  None of those situations exists in this case, as the commissioner and the trial court properly ruled in denying the cross-bill.

Finally, we summarily reject the buyer's contention that the mechanic's lien was unenforceable.  The buyer contends that because the materials were removed from the building before the memorandum was filed, the goods did not enhance the value of the building, thus making the lien invalid.

Code § 43-3 authorizes a lien in favor of "[a]ll persons performing labor or furnishing materials . . . for the construction . . . or improvement of any building."  The seller furnished materials for this building project, and the cabinets

were delivered, accepted, installed, and added value to the structure.  The fact that the cabinets were removed before the memorandum was filed is irrelevant.  The legislature could not have intended that a supplier's mechanic's lien may be avoided simply by removing from the building the materials furnished and incorporated in it.

Consequently, we hold that the commissioner's factual findings confirmed by the trial court are not plainly wrong but are supported by credible evidence, and that the court's conclusions of law are correct.  Thus, the judgment of the trial court will be

<u>Affirmed</u>.